## MASONIC AID ASSOCIATION v. TAYLOR, Auditor.

1. An association organized under the general incorporation laws of the state, the principal object and functions of which are to secure to each member thereof the payment on his death, to his benefi-

ciary or representative, of a certain sum of money, subject to the fulfillment of the conditions imposed by the charter and by-laws, is essentially a life insurance company, and the relations between such companies and the members are purely business relations, based upon contract.

2. The fact that such an association restricts its membership to persons belonging to, and in good standing in, a fraternal or benevolent society known as "Free and Accepted Masons," under 50 years of age, does not make it a secret, benevolent, or fraternal society, and does not bring it within the proviso to Section 53 of the insurance laws of the state.

(Syllabus by the Court. Opinion filed October 20, 1891.)

Application for *mandamus*, original in this court, made by the Masonic Aid Association of Dakota against L. C. Taylor, as state auditor of South Dakota, to compel the issuance of a certificate of authority. Denied. No briefs filed.

The facts are fully stated in the opinion.

*L. B. French*, for plaintiff.

PER CURIAM. This is an original action for a writ of *mandamus* to be directed to the Honorable L. C. Taylor, auditor of the state, commanding him to issue to the said Masonic Aid Association of Dakota a certificate of authority to do business in said state in accordance with the charter of said association and the laws of South Dakota. The petition shows that this association made due application to the auditor for such certificate, but the auditor refused to issue it because the association had not paid the 2 per cent tax on the gross amount of its assessments into the state treasury, as required by law. This fact is admitted by the association, but it claims that it is exempt from the payment of this tax because it is a secret, benevolent, or fraternal society, which is denied by the auditor. We do not understand there is any serious dispute as to the law which must govern the decision to be made, when the character of the organization is determined. It is therefore necessary that a full statement should be made of the organization and objects of the association, and its manner of doing business.

We find by the record that the association was incorporated under Article 14, Chapter 3 of the Civil Code. Its arti-

cles of incorporation state "that the objects for which this corporation is formed are to provide for the payment to the widow, child or children, or mother, or such other person or persons as may have been duly designated to receive the same, of any members of such association as may decease, from time to time, of such a sum as the by-laws of said association may provide; such sums to be raised by voluntary contribution to the same by members of the association. That the members of said association shall be Masons in good standing." The association is under the control and management of 11 directors. The by-laws adopted under the articles of incorporation state, among other things, that its name shall be the "Masonic Aid Association," and is formed for the purpose of aiding and assisting the widows and orphans of worthy brother Masons. Section 9 of the by-laws states who may become members, as follows: "All Masons in good standing who are not over fifty years of age, and can pass the required medical examination, may, if accepted, become members of this association." Section 10 states that "applications for membership to the association shall be made upon printed forms furnished by the association, accompanied with a membership fee * * * and the certificate of a competent medical examiner." Section 13 provides that, "when an applicant shall .have been accepted, he shall receive a certificate of membership, signed by the president and secretary, and sealed with the seal of the association. Said certificate, together with his application and these by-laws, shall constitute the agreement and contract between the member and the association, which shall not be in force until after the payment of the membership fee." The members of the association shall be divided in two divisions, known as "Division .A," certificate to be limited to $2,000; "Division C," certificate to be limited to $1,000; applicants to designate the division they desire to enter, and may take either or both. The membership fees are, in Division A—limited to $2,000—$6; in Division C,—limited to $1000—$4; medical examination fee additional.

By these extracts from the charter and by-laws of the as-

sociation it will readily be seen that the principal object and function of the association is to secure to each member thereof the payment on his death, to his beneficiary or representative, of the sum of $1,000 or $2,000, or both, subject to the fulfillment of the conditions imposed by the charter and by-laws of the association. The pecuniary provision is the same as that secured by ordinary life insurance. But, while this is so, it is contended by the association that it has no resemblance to any known mutual benefit insurance company, for the reason that the relations between such insurance companies and their members are purely business relations, based upon contract, and therefore cannot be changed except by mutual consent. In such associations all that the assured has to do is to pay his dues and assessments; but in this the right to pecuniary benefit is merely incident to, and absolutely dependent upon, being a member of, and a continued membership in, a fraternal society, subject to its laws. This position we think untenable. In order to determine the primary purpose of the association, reference must be had to the conditions of membership and the business conducted. There can be no dispute but that the applicant for membership must be a Mason; must be insurable, that is, of proper age—not over 50 years; must have a physician's certificate of physical condition. The qualification of membership is not dependent upon being a Mason or belonging to that fraternal organization alone, but the qualification is made ultimately to depend upon the question as to whether the applicant is insurable under the charter and by-laws of the association; that is, is he in good, sound physical condition, and under 50 years of age, at the time of applying? While the applicant must be a Mason, yet all Masons are not entitled to, nor can become, members of the association. The conclusion is inevitable that the association, while it assumes to admit none but Masons as members, cannot be termed a "fraternal organization." It has none of the incidents usually connected with such associations. There is no secret work or pass-words, or anything of a moral, literary or scientific character which in any manner affects its members or its organization. Nor do purely

.fraternal organizations require that the members should be in-
surable.   The primary purpose of the organization may also be
ascertained by reference to the business conducted, the manner
of conducting it, and what provisions have been adopted for the
purpose of carrying into effect the several avowed objects of
the organization   Doing this we find that the certificate of
membership provides that upon the death of each member, if
during life he has fully complied with the requirements of the
organization, there shall be paid to such person as he may des-
ignate the sum of money mentioned in said certificate, and that
he or his beneficiary is entitled to nothing more.   Fraternal or-
ders and associations usually provide for sick benefits and fu-
neral  expenses, without regard to age or physical condition of
members at time of admission.   This association does noth-
ing of the kind.   If the word "Mason," and the restriction of
membership to the Masonic fraternity, be eliminated from the
association, its primary and only purpose is that of a life insur-
ance organization. Neither can it be claimed to be a benevolent
society, paying sick or death benefits.   The origin of all life in-
surance is traceable to benevolent motives.   The object of all
such insurance is to provide a fund for the widows and orphans
of a person whose income ceases with his life.   But whatever
may be the motive underlying the scheme, it is certain that, in
its practical application, life insurance is, and must be, founded
upon contract.   Its benevolence must flow, not from mere good
will, but from legal obligation.   Its gifts must not depend upon
the continuance of the charitable impulses of those who pay,
but upon mutual promise.   Although the objects of the insurer
in making the  contract, and  the  objects  of  the  organization
with which he  contracts, are benevolent, and not speculative,
they have no bearing upon the nature and effect of the business
conducted and the contract so made; nor will the character of
the contract be changed by the fact that the organization issu-
ing it designates itself as a benevolent or charitable society in-
stead of an insurance company.  The name of the society will
not necessarily fix or establish its real character.   If the gen-
eral purpose and nature of an association, of whatever kind or

name, be that of insurance, its legal character will not be changed by the benevolent or charitable results of its beneficence. A society which, by contract, agrees to pay to the beneficiary of a deceased member a sum of money, is an insurance company, whatever may be the terms of payment of the consideration by the member, or the mode of payment of the sum to be paid in the event of his death.

The leading case upon this subject is Com. v. Wetherbee, 105 Mass. 160, wherein the court says: "A contract of insurance is an agreement by which one party, for a consideration, (which is usually paid in money, either in one sum or at different times during the continuance of the risk,) promises to make a certain payment of money upon destruction or injury of something in which the other party has an interest. In fire insurance and marine insurance the thing insured is property; in life or accident insurance it is the life or health of a person. In either case, neither the time and amounts of payments by the assured, nor the modes of estimating or securing the payment of the sum to be paid by the insurer, affect the question whether the agreement between them is a contract of insurance. All that is requisite to constitute such a contract is the payment of the consideration by the one, and the promise of the other to pay the amount of the insurance upon the happening of injury to the subject by a contingency contemplated in the contract. The contract made between the Connecticut Mutual Benefit Company and each of its members by the certificates of membership issued according to its charter does not differ in any essential particular of form or substance from an ordinary policy of mutual life insurance. The subject insured is the life of the member. The risk insured is death from any cause not excepted in the terms of the contract. The assured pays a sum fixed by the directors, and not exceeding ten dollars, at the inception of the contract, and assessment of two dollars each annually, and of one dollar each upon the death of any member of the division to which he belongs, during the continuance of the risk. In case of the death of the assured by a peril insured against, the company absolutely promises to pay

to his representatives, in sixty days after receiving satisfactory notice and proof of his death,  as many dollars as there are members in the same division, the number of which is limited to five thousand.   The payment of this sum is subject to no contingency but the insolvency of the corporation.   The means of paying it are derived from the assessments collected upon his death from other members; from the money received  upon issuing other certificates of membership, which the by-laws declare may, after  payment of expenses, be 'used to cover losses caused by the delinquencies of members;' and from the guaranty fund of one hundred thousand dollars, established by the corporation under its charter.   This is not the less a contract of mutual insurance upon the life of the assured because the amount to be paid by the corporation is not a gross sum, but a sum graduated by the number of members holding similar contracts; nor because a portion of the premiums is to be paid upon the uncertain periods of the deaths of such members; nor because in case of non-payment of assessments by any member, the contract provides no means of enforcing payment thereof, but merely declares the contract to be at an end, and all moneys previously paid by the assured, and all dividends and credits accrued to him, to be forfeited to the company." To the same effect we cite the following:   State v. Society, 72 Mo. 146; Bolton v. Bolton, 73 Me. 299; Erdmann v. Insurance Co., 44 Wis. 376; Dietrich v. Association, 45 Wis. 79; Society v. Winthrop, 85 Ill. 537; Farmer v. State, (Tex. Sup.) 7 S. W. Rep. 220; State v. Insurance Co., 30 Kan. 585, 2 Pac. Rep. 840; Berry v. Indemnity Co., 46 Fed. Rep. 442; State v. Association, 18 Neb. 276, 25 N. W. Rep. 81; Wall v. Society, 32 Fed. Rep. 273.

    In discussing the subject of mutual assessment insurance, courts have intimated that possibly there is a distinction between a society the primary object of which is to contract with its members for the insurance of their lives, and a society organized for social, literary, or benevolent purposes, to which a feature of mutual insurance is added for the purpose of mutual aid.   The distinction, however, is that, while the contract is one of mutual life insurance, the societies having the feature of

mutual aid cannot be said to be carrying on a general business
of life insurance.   Barbaro v. Occidental Grove, 4 Mo. App.
429; State v. Association, 6 Mo. App. 172; Swift v. Exchange
Board, 67 Cal. 567, 8 Pac. Rep. 94.   We have not been able to
find any case in which it has been held that such a society is
not an insurance company, within the meaning of the statutes
regulating insurance companies, except where such society was
chartered under special laws providing for the incorporation of
such societies.   The Masonic Aid Association, now under con-
sideration, was incorporated under the general incorporation
act, and in every consideration of the case this organization
must be regarded as a mutual benefit association, and not a se-
cret, benevolent, or fraternal society which pays sick or death
benefits to the widows and orphans or heir or relative of de-
ceased members, and does not come within the proviso of Sec-
tion 53 of the insurance laws of South Dakota.   Writ of *manda-
mus* denied.